IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MYESHA MONIQUE EMMITT, §
§
§
Plaintiff, §
§
V. §
§ CIVIL ACTION NO. 4:17-cv-02953
ANDREW SAUL, ACTING §
COMMISSIONER OF THE SOCIAL §
SECURITY ADMINISTRATION, §
§
Defendant. §

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Defendant's Cross Motion for Summary Judgment (Document No. 15) and Memorandum in Support (Document No. 15), Plaintiff's Motion for Summary Judgment and Response to Defendant's Brief (Document No. 20), and Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 21). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 15) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 20) is DENIED, and the decision of the Commissioner is AFFIRMED for further proceedings.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on September 24, 2018. (Document No. 13).

## I. Introduction

Plaintiff, Myesha Monique Emmitt ("Emmitt") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").

Emmitt claims the Administrative Law Judge ("ALJ"), Daniel E. Whitney, found Emmitt was not disabled based on no substantial evidence and by applying improper legal standards. Emmitt argues that the ALJ failed to follow the Appeals Council's ("AC") remand order by not following the requirements set forth by Social Security Ruling (SSR) 82-59 concerning Plaintiff's refusal of treatment. Additionally, Emmitt states that the ALJ's residual functional capacity ("RFC") erred by providing no evidence to support the change in capacity to interact with the public from the first ALJ decision to the second.

The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Emmitt was not disable, that the decision comports with applicable law, and that the decision should, therefore be affirmed. The Commissioner contends that the ALJ was not required to follow SSR 82-59 because the ALJ had not invoked 20 C.F.R. § 404.1530 and § 416.930 to find Emmitt was not disabled. Instead, the ALJ found Emmitt disabled at step 5. The Commissioner also argues the ALJ based the RFC on substantial evidence and that the ALJ's first decision was no longer binding.

## II. Administrative Proceeding

On June 23, 2014, Emmitt filed for SSI and DIB claiming she has been disabled since May 13, 2011, due to bipolar disorder and learning disorder. Tr. 434-46. Her applications were initially denied, as well as in reconsideration. Tr. 127-84, 229-36, 240-328. Emmitt requested a hearing

before an ALJ. Tr. 217-28. The Social Security Administration granted the request and a hearing was held on April 4, 2016. Tr. 61-110.

On April 27, 2016, the ALJ found that Emmitt was not disabled. Tr. 188. The ALJ found that Emmitt met the insured status requirements and that she has not engaged in substantial gainful activity since May 13, 2011, the alleged onset date. Tr. 190. While the ALJ found the impairments of bipolar disorder, personality disorder, and learning disability, were severe, the impairments did not meet or equal the severity of one of the listed impairments.

The ALJ determined Emmitt's RFC as able to complete work at full functional levels but with certain limitations. Tr. 193. This includes:

- Limited simple one, two, three type repetitive tasks
- Occasional intersection with the public, coworkers, and supervisors
- No production rate pace work
- Simple word recognition
- Simple addition, subtraction
- No reading for meaning
- No written requirements

(Tr. 193). At step five, the vocational expert ("VE") found that Emmitt was capable of being a laundry worker, an industrial cleaner, or an office cleaner, and was not disabled. Tr. 106. Additionally, the ALJ found that Emmitt did not meet the requirements as set forth by SSR 82-59, as she failed to follow a prescribed treatment. Tr. 201.

Emmitt sought review from the Appeals Council ("AC"). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) there appears to be an abuse of discretion by the ALJ; (2) the ALJ made an error of law in the determination; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest; or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. 20 C.F.R. §

404.970(a). The AC granted Emmitt's request for review and remanded the matter to the ALJ to obtain additional evidence regarding Emmitt's refusal of treatment, pursuant to SSR 89-52, and instructed the ALJ to reassess the RFC and VE's evidence, if necessary. Tr. 214.

Another hearing took place on February 27, 2017. Tr. 112-26. Then, the ALJ reconsidered Emmitt's case and issued a second unfavorable decision on April 19, 2017, again finding Emmitt was not disabled.  Tr. 21-36. The ALJ made a new RFC determination and relied on the VE's testimony that Emmitt not disabled. Tr. 35.

Emmitt requested review before the AC, which was denied on July 21, 2017, resulting in the ALJ's findings and decision becoming final. Tr. 3.

Emmitt has timely filed her appeal of the ALJ's second decision. The Commissioner has filed a Motion for Summary Judgment (Document No. 15). Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 20). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1-1290 (Document No. 8). There is no dispute to the facts contained therein.

### III. Standard for Review of Agency Decision

A court reviewing the Commissioner's denial of disability insurance benefits is limited to determining whether (1) the decision is supported by substantial evidence in the record, and (2) the Commissioner applied the proper legal standards. *Higginbotham v. Barnhart*, 405 F.3d 332, 335 (5th Cir. 2005); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). The court must review the entire record but may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner, including evidence either favorable or contrary to the Commissioner decision. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990); *see also Jones*, 174 F.3d at 693. If conflicts arise in the evidence, the Commissioner must resolve

them. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and will be affirmed. 42 U.S.C. § 405(g) (2016); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). Under the Act, substantial evidence requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). Furthermore, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). No substantial evidence is found "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id.* (quoting *Hemphill v. Weinberger*, 483 F2d 1127 (5th Cir. 1973)).

## IV. Burden of Proof

A claimant holds the burden of proof in establishing entitlement to disability insurance benefits under the Act. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Laboratory diagnostic techniques must prove the impairment. *Id.* at (d)(3). Additionally, the impairment must be so severe as to limit the claimant as follows:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if he applied for work.

Id. at (d)(2)(A). Presence of an impairment does not establish the severity to determine disability. In assessing whether an applicant is capable of performing any "substantial gainful activity," the

Secretary uses a five-step sequential analysis:

> 1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

> 2. An individual who does not have a "severe impairment" will not be found to be disabled.

> 3. An individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

> 4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

> 5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

*Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988) (paraphrasing 20 C.F.R. § 404.1520(b)-(f) (1988)); *see also Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). The claimant has the burden of proof for the first four steps, but the burden shifts to the Commissioner for the fifth. *Thomas v. Shalala*, 56 F.3d 1385 (5th Cir. 1995); *see also Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989). If the Commissioner satisfies the burden to show claimant is capable of engaging in some type of alternative work that exists in the national economy, the burden of proof shifts back to the claimant to rebut this finding. *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *see also Chaparro v. Bowen*, 815 F.2d 1008, 1010 (5th Cir. 1987). If at any point in the analysis a disability determination is made, it is conclusive and terminates any further analysis. *Thomas*, 56 F.3d at 1385; *see, e.g., Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren v. Sullivan*, 925 F.2d 123, 129 (5th Cir. 1991);

*see also Fall v. Astrue*, No. CIV.A. H-12-0265, 2012 WL 6026438, at *4 (S.D. Tex. Dec. 4, 2012).

**V. Discussion**

A. Objective medical evidence

Emmitt has a history of hospitalization, going back to 2003. Tr. 1081-1164. She was diagnosed with mood disorder in August 2003, then bipolar disorder in November 2003. Tr. 722, 742. She was treated with several medications throughout her medical history including Lexapro, Depakote, Risperdal, Concerta, Wellbutrin, Lexapro, Abilify, and Trazadone. Tr. 72-73, 722-23, 861, 1216. Emmitt at the time of the hearing was taking Gabapentin and Abilify. Tr. 120, 717.

Her hospitalizations continued, most frequently after altercations when younger then after self-harm or threats when she was older. In 2003, her first hospitalization occurred after suicidal ideation, then again in the next couple of months due to homicidal ideation and assaultive behavior toward her grandfather. Tr. 741-42. An altercation on the school bus with another student in October 2004 and physical fight with her brother in November 2004 led to hospitalizations where the doctor noted a deteriorating condition and decrease in sleep and appetite, but no suicidal ideation or paranoia. Tr. 789, 806. Her medical records indicate that she had been in juvenile detention twice for fighting. Tr. 1217. Her next hospitalization is recorded in February 2008 at Ben Taub, after a vehicular collision and does not report any issues related to her claimed disability. Tr. 1207.

The medical record lacks evidence on Emmitt's hospitalizations or medical treatment until 2012, after two examinations with psychiatric consultations Tr. 811-17, 1187-94. In January 2012, Emmitt was brought into MHMR by the police in a state of intoxication. Tr. 835. She stated her episode was in response to being alone, drinking, and thinking about her deceased grandparents. Tr. 833. The treatment notes state that Emmitt's friends reported her being erratic and Emmitt

became agitated and uncooperative in the assessment. Tr. 832. Later in the day, Emmitt received a GAF[2] of 55, she was alert, had clear senses, and was logical, cooperative, and well-kept. Tr. 834.

On May 30, 2014, MHMR treatment records state that Emmitt was admitted because her family called the police concerning Emmitt outside with a knife and reported she was angry, crying, and was hearing her deceased grandparents' voices, and did not want to be in the world anymore. Tr. 824. Once admitted, she denied any use of medication and voiced suicidal ideations and crying spells. Tr. 822. She was alert but agitated. Tr. 822-23. During an assessment, the doctor wrote that Emmitt had an unkempt appearance, poor eye contact, had a negative attitude, was frustrated, and had a depressed mood, labile affect, logical thoughts, clear senses, and auditory hallucinations. Tr. 827. She was given a GAF score of 28. *Id.*

On May 31, 2014 to June 3, 2014, Emmitt was transferred from the NeuroPsychiatric Center on a Mental Health Warrant to University of Texas Harris County Psychiatric Center and was examined by Dr. Crispa J. Aeschbach Jachmann with attending physician Jonathan Findley. Tr. 841, 975-96. Her initial affect was recorded as alert and cooperative, with logical thought and poor knowledge, but average intelligence. *Id.* Her mental status exam shows that Emmitt easily engaged with examiners. Tr. 844-47. She was in good physical health and appeared motivated for treatment. Tr. 847. However, deterioration in function was exhibited and she was positive for hallucinations. Tr. 848. Her admitting GAF is recorded as 25. Tr. 847.

Upon discharge, the medical record shows she has "[v]ery much improved." Tr. 852. She

---

[2] Generally, global assessment of functioning, or GAF scores reflect the clinician's judgment of the individual's overall level of functioning. The GAF scale may be useful in tracking the clinical progress of individuals. GAF scores ranging from 41 to 50 are indicative of serious symptoms or serious impairment in one of the following: Social, occupational or school functioning. A GAF between 51 and 60 is indicative of moderate symptoms or moderate difficulty in one of the following: social, occupational, or school functioning. GAF of 61-70 is indicative of mild symptoms in one area, or difficulty in one of the following: social, occupational, or school functioning, but the person is generally functioning pretty well and has some meaningful interpersonal relationships. *See the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), copyright 2000 American Psychiatric Association.*

was given medication to temper anger issues and through her hospitalization she was compliant with medication, groups, and treatment plans. Tr. 858. Her GAF rose to 45 due to her lack of suicidal or homicidal ideations, adequate sleep patterns and appetite, and medication (Abilify). Tr. 858-59.

At a follow-up visit with Dr. Nishan Adietty on June 11, 2014, Emmitt had normal speech, was cooperative, had appropriate affect, alert senses, intact memory, appropriate knowledge for age and educational level, good attention span and concentration, and limited insight and judgment. Tr. 861-63. Dr. Adietty increased Abilify and Trazodone, as well as suggested that she participate in therapy, alcoholics anonymous, and request housing and employment assistance. Tr. 864. Emmitt was diagnosed with bipolar disorder, alcohol dependence, and personality disorder and given a GAF of 50. Tr. 866. None of her symptoms[3] were rated severe by the Adult Needs and Strengths Assessment. Tr. 868-72. Her treatment plan included her goals such as working to "be able to do for [her]self." *Id.* Her treatment continued, meeting five times in the following month, until July 22, 2014. Tr. 912-26, 930-39; *see also* Tr. 1046-54. The record ends on August, 5 2014, after Emmitt failed to attend a scheduled appointment. Tr. 912, 930. Records indicate the MHMRA clinic was unable to contact Emmitt, either over the phone or by going by Emmitt's house. Tr. 1046-47.

In November 2014, Emmitt was admitted to MHMRA through an NPC Crisis Center. Tr. 953-57. Emmitt called a crisis hotline stating suicidal thoughts, that she had a desire to choke people, and auditory hallucinations. *Id.* Her assessment on November 18, 2014 showed she was

---

[3] These symptoms include: Risk Behaviors - recent suicide risk or dangers to others, and exploitation; Suicide Risk - Suicide ideation; Life Domain Functioning - Moderate family functioning, moderate social functioning and sleep and decision-making; Strengths - useful optimism; Dangerousness - recent acts in frustration management, hostility, paranoia, gains from anger, violent thinking; Behavioral Health Needs – Though disturbance, cognition, depression, anxiety, mania, impulse control, interpersonal problems were sufficient to cause problems, consistent with diagnosable disorder.

severely agitated and verbally threatening at time of admission. Tr. 954. She possessed thoughts or plans of suicide. *Id.* The record states she was irritable, with limited support, no income or stable housing, and was off her medication since she missed her last clinic appointment. Tr. 912, 930, 958-59. Her mental examination shows she had poor eye contact, minimal speech, depressed mood, irritability, she was alert, her memory was intact, judgment and insight were poor, and intellectual functioning was average. Tr. 960-62. She received a GAF of 30. *Id.* Emmitt stated she was feeling better after a day of rest and was escorted by a constable to HCPC on November 19, 2014. Tr. 965.

Upon discharge to HCPC, Emmitt stated she did not want to be there and yelled at staff, cried, wanted to sleep and go home. Tr. 997. Treatment notes show that she was off her medications for a week because she was unable to schedule a new counseling appointment. *Id.* She was irritable on evaluation with suicidal thoughts and depressive symptoms and was given a GAF of 29. Tr. 1001. She reported that the combination of Aripiprazole and Trazodone had been very effective, and that she wanted to continue. *Id.* Upon discharge on November 20, 2014, Emmitt's condition was very improved, she had a GAF as 45, she said she felt fine and "just needed [her] medicine," and was compliant with said medication. Tr. 1007, 1010-11.

In her medical maintenance report from November 25, 2014, Emmitt states that she has been hospitalized fifteen times in her teens and three times since then. Tr. 1037, 1072. Her record notes a breakup that led to her drinking, becoming depressed, and possessing suicidal thoughts. Tr. 1072. The record states that anger is her main problem and that she states she does well as long as she takes her medication. Tr. 1037, see also Tr. 1040, 1072. The record also indicates that there was an increase in Abilify medication which she did not report any side effects. Tr. 1037, 1040. She was reported as being cooperative, aggressive, irritable, and angry. Tr. 1038. Additionally, the

report states she was "[s]table and much improved on [her medication]." Tr. 1039.

On December 29, 2014, Emmitt had a follow-up appointment with MHMRA. Tr. 1062-1071. Her alcohol dependency was in partial remission. Tr. 1068. The record states she last drank two days before her appointment. Tr. 1064. Her mental status exam recorded her as having a cooperative attitude, euthymic mood, and constricted affect. Tr. 1069. She did not have any hallucinations or suicidal or homicidal ideations. *Id.* She possessed an intact memory, alert and good concentration, average intellect, limited knowledge and insight, and fair judgment. Tr. 1069-70. The parties again made a treatment plan to better cope with Emmitt's suicidal ideations. Tr. 1061-67; *see also* Tr. 1062.

Emmitt again had face-to-face meetings with MHMRA staff on December 31, 2014 in addition to her appointment on December 29, 2014. Tr. 1077-80. In this meeting, the staff member reported her as being appropriate in mood, cooperative, and anxious but otherwise appropriate and alert. Tr. 1079. The parties identified barriers and ways to make progress, and Emmitt was open to meeting about housing options. *Id.* Emmitt discussed medication changes, including concerns over the reduction in Abilify dosage and claiming the Trazodone was not helping her sleep, but she overall "[s]howed progress toward her treatment plan goals." *Id.*

On March 2, 2015, Emmitt had another follow-up appointment. Tr. 1175. Emmitt complained of anger and insomnia. *Id.* The report shows she ran out of medication two weeks prior and she is "[n]ot motivated to get better. Tr. 1175. Emmitt's Trazodone medication was increased from 100mg to 300mg. Tr. 1172-74, 1178.

On May 22, 2015, Emmitt reported that she was not doing well. Tr. 1169. Emmitt explained that her Trazodone medication was too strong. *Id.* She was prescribed Paxil. *Id.* Results of the mental status exam show that Emmitt had a depressed and anxious mood, but otherwise was

cooperative, and alert, and had no homicidal or suicidal ideations or hallucinations. Tr. 1170.

On June 22, 2015, Emmitt reported problems with her illness but was receptive to all treatment. Tr. 1181. She reported that she has applied for SSI and was living with brothers. *Id.* Her reported major goal in treatment was seeking housing, but the evaluation noted that Emmitt had shown little progress in this area. Tr. 1182. She reported not drinking for 180 days. Tr. 1183. Three months later, on September 22, 2015, MHMRA reported Emmitt had not returned for services and would need to be reauthorized to receive treatment. Tr. 1185.

Emmitt was voluntarily hospitalized at Ben Taub on March 10, 2016. Tr. 1199-205. Emmitt reported voices talking to her. *Id.* Hospital treatment notes show that Emmitt expressed a desire to reengage with MHMRA. Tr. 1199. She responded well to the medication. *Id.* She reported being off her medication, but after medication and ten hours of observation was alert and oriented without hallucinations or suicidal or homicidal ideations. *Id.* Emmitt was cooperative, childlike, alert, and not agitated, as well as possessed a fair memory, organized thoughts, intact attention, and had "good" knowledge. Tr. 1200-201.

On March 23, 2016, Emmitt attended an intake appointment at MHMRA after her file was closed on September 22, 2015. Tr. 1215. She ran out of Trazodone, Abilify, and Paxil on March 22, 2016, and since then complained of feeling irritable wanting to harm herself. *Id.* Results of Emmitt's mental status exam show that she was cooperative but irritable, angry, anxious, and depressed. Tr. 1218. She had logical thought and no suicidal or homicidal ideations. *Id.* Hallucinations were present, but she was alert, with appropriate knowledge for age and education level and had good concentration. *Id.* Emmitt was given new prescriptions. Tr. 1220. Emmitt reported that she had been in jail for trespassing, then incarcerated for criminal mischief of kicking on someone's window. Tr. 1217. She had a GAF of 40. Tr. 1229. The MHMRA doctor

recommended inpatient treatment but Emmitt declined; however, she was open to other forms of treatment. Tr. 1222. Emmitt and a MHMRA staff member subsequently developed goals, which included no thoughts of self-harm or suicide and to improve unstable mood and negative thoughts, and to reduce lack of motivation, isolation, loss of appetite and sleep, racing thoughts. Tr. 1223. Emmitt stated she felt "good for the most part" in a medication maintenance report from June 22, 2016. Tr. 1283. She did not report any suicidal or homicidal ideations, auditory hallucinations, alcohol use, or major side effects from her medication. *Id.* She was cooperative with euthymic mood and appropriate affect. Tr. 1285. There was no change in her GAF score from her prior visit. Tr. 1286.

On September 2, 2016, Emmitt met with a doctor at the MHMRA Northwest Clinic. Tr. 1239. She complained of feeling depressed and expressed thoughts of anger toward family, with thoughts of killing them. *Id.* She had run out of medication two weeks before and drank "as much as [she could]" to cope. *Id.* She reported hearing voices telling her to hurt her family. *Id.* She also had minimal sleep and appetite. *Id.* While having homicidal ideations toward the family she lived with and auditory hallucinations, she wanted "just to get rid of them all." Tr. 1278. The Harris Center for Mental Health recommended that Emmitt be admitted to the hospital, believing she was in need of a stable environment and to continue taking medication. Tr. 1278-81. The physician gave her a poor prognosis, as her family seemed unsupportive, and her abuse of alcohol, and GAF of 30. Tr. 1242-44.

In a follow-up therapy appointment on September 15, 2016, Emmitt stated her problem as expressing herself, and that MHMRA and treatment helps her because "[she] cannot do that at home." Tr. 1268. Treatment plan goals included her building self-confidence and finding a place to live. *Id.* She blamed her "attitude" and "mouth" as her barrier to improving health. *Id.* Emmitt

stated she wants to avoid hospitalization. Tr. 1269. She stated she knows she will always need her medication, but she wants to be independent and on her own. *Id.* The progress note reveals Emmitt had a lack of progress in many areas as evidenced by Emmitt's hospitalizations, arguments with family, and no stable housing; however, Emmitt had shown progress in abstaining from alcohol. Tr. 1272. Her individual progress notes show a normal and appropriate (euthymic) mood, affect, and she was cheerful. Tr. 1276. She reported that it is "sometimes hard for her to make her [appointments] sometimes because she does not have transportation and she doesn't know how to ride the bus." Tr. 1276.

On October 12, 2016, Emmitt showed a normal mood and affect. Tr. 1263. She reported auditory hallucinations. *Id.* She also showed progress in wanting to get "at least [a] part time" job and stated she would physically go to Department of Assistive and Rehabilitative Services (DARS) location for help in seeking job. Tr. 1266. Emmitt continued to report that she was seeking stable housing. Tr. 1265. Her Medical Maintenance Report reveals that she had been compliant with medication and had no issues with her family because she stated she stayed out of the house a lot. Tr. 1257. According to the progress notes, Emmitt's symptoms had improved since last hospitalization with her continued use of Abilify and Gabapentin. Tr. 1260.

A Medical Maintenance Report from December 7, 2016 shows that Emmitt reported doing well on her current medications. Tr. 1252. She was staying with her father and stepmother. *Id.* Emmitt's prescriptions were refilled. Tr. 1255.

On December 12, 2016, MHMR Individual Progress Notes showed normal and appropriate mood and affect and good insight. Tr. 1249-50. Emmitt had made progress in being "sure to attend the collaborative care appointment," in trying to take walks, and had called to find out what information she needs to apply for food stamps. *Id.* Additionally, Emmitt showed progress in the

ability to recognize symptoms, and warning signs, and coping techniques to deal with her illness. *Id.*

No unusual observations were observed at Emmitt's appointment on February 13, 2017. Tr. 1246, 1248. Emmitt's thoughts were logical, and she showed good judgment and insight. Tr. 1248. Her mood was appropriate and euthymic. *Id.* Emmitt was living with her significant other but spoke of friction in the relationship. Tr. 1246. She showed progress in identifying how anger physically affects her. Tr. 1248. She described listening to positive music or indulging in something positive to control anger. *Id.*

Emmitt's educational records show she met specific criteria for a learning disability in 2001. Tr. 530, 554, 557. She went through several tests, including the Kaufman Assessment Battery for Children and the Woodcock-Johnson Test of Achievement. Tr. 530-55. During these tests, no behavioral problems were observed. Tr. 549. Additionally, they show continued educational difficulty up to 2007, showing she was combative and refused to follow direction. Tr. 504. She refused to participate in tests and exhibited verbal and physical aggression. *Id.* Her learning disabilities were recorded in affecting her achievement in math, reading, and writing. Tr. 480, 487. The Department of Special Education developed an educational plan for Emmitt and found her capable of performing in general education with accommodations and in postsecondary education, and able to independently function in the community and in daily life. Tr. 484.

On September 9, 2010, Dr. Cecilia P. Lonnecker evaluated Emmitt. Tr. 46-52. The IQ test showed a deficient mark and borderline range, but Dr. Lonnecker noted "the full scale score which fell in the borderline range, should be interpreted with extreme caution" due to significant discrepancies among the index scores. Tr. 49. Emmitt exhibited low average processing range and below accurate reasoning, vocabulary, and attention to discrete information. Tr. 49. Dr. Lonnecker

diagnosed Emmitt with a GAF of 50. Tr. 50. She considered her special education in school, "current academic achievement" equal with the cognitive index but below grade level achieved in school, symptoms of conduct disorder, and a sense of no self-responsibility. *Id.* Lonnecker noted Emmitt did not vocalize motivation to pursue education or vocational endeavors but stated she may benefit from training and placement. *Id.* Additionally, Dr. Lonnecker opined that Emmitt was capable of handling financial affairs with assistance as needed. *Id.* Dr. Lonnecker did not report any difficulty in administering the test or interactions with Emmitt. Tr. 46-52.

Emmitt was evaluated by Dr. Tonna Pate on April 28, 2011. Tr. 812-16. Emmitt reported that she does not sleep at night because she does not trust people and she has been attacked for no reason. Tr. 812. Also, Emmitt stated that she had not sought treatment because she could not schedule appointments for herself and had "road blocks," including being disqualified for MHMRA services or busy phone lines. *Id.* Emmitt acknowledged her anger issues manifested in punching walls, breaking things, hitting people, or beating her head. Tr. 813. Emmitt reported that she was not on medication at the time of this consultation. *Id.* She denied any issues with personal care, concentration, or alcohol. *Id.* Dr. Pate diagnosed Emmitt with a GAF of 55. Tr. 815.

On September 4, 2014, Emmitt was evaluated by Dr. Andrea Pellegrini. Tr. 943-49. In this consultative psychologic exam report, Dr. Pellegrini noted that Emmitt was taking medication prescribed from MHMRA, where she receives counseling and psychiatric care. Tr. 944. Emmitt reported mood swings and paranoia when she is off her prescribed medication. *Id.* Emmitt reported that she had been hospitalized two months ago due to a nervous breakdown. Tr. 945. She had not been on her medications at the time. *Id.* Since then, she restarted treatment and she reported she had improved. *Id.* In terms of social functioning, she reported maintaining a few social relationships. *Id.* She also reported a history of hallucinations including green men, shadows, and

voices that have told her to do bad things. Tr. 944. Emmitt reported that she had been fired from the convention center and the Dollar Store because she was not "doing the job right." Tr. 945. Dr. Pellegrini opined that Emmitt had concrete thinking, limited abstract thinking, mildly anxious mood, and clear cognition. Tr. 947. Dr. Pellegrini perceived her intelligence at lower average to borderline with memory, short and long term, as intact. *Id.* Throughout her examination, Emmitt was appropriate and cooperative according to Dr. Pellegrini. Tr. 946.

Dr. Pellegrini diagnosed Emmitt with Unspecified Bipolar Condition, with a fair prognosis. Tr. 948-49. Additionally, Dr. Pellegrini determined Emmitt's functional capability as having "difficulty persisting in work-related activity and maintaining effective social interaction on a consistent and independent basis" given her diagnosis. Tr. 949. Overall, Dr. Pellegrini opined that if Emmitt abstained from alcohol and stabilized her mood symptoms, vocational services for job placement "may be beneficial" and that Emmitt could manage benefits on her own. *Id.*

On September 19, 2014, Emmitt's records were examined by Dr. Leela Reddy through the state agency. Tr. 127-39. Dr. Reddy opined that Emmitt had understanding and memory limitations that were significantly limited in work-like procedures, locations, or short simple instructions. Tr. 136. Dr. Reddy further opined that Emmitt was markedly limited in her ability to understand detailed instructions. Tr. 136. In sustained concentration and persistence limitations, Emmitt was not significantly limited in carrying out simple instructions but markedly limited in carrying out detailed instructions and moderately limited in maintaining attention and concentration for extended periods. Tr. 136. Additionally, Dr. Reddy found Emmitt was not significantly limited to sustain a routine without supervision or make work related decisions. Tr. 136-37. Emmitt was moderately limited in the ability to work with or in proximity to others without being distracted. Tr. 137. In terms of her social interaction limitations, Emmitt was found to be only moderately

limited in her ability to appropriately interact with the general public and to accept instructions and respond appropriately. *Id.* Specifically, Emmitt could interact adequately with coworkers and supervisors. *Id.* Emmitt's records were also examined by Dr. Matthew Snapp, a disability determination unit physician, on January 28, 2015. Tr. 155-68. Dr. Snapp concurred with Dr. Reddy. Tr. 165; *see also* Tr. 136.

Dr. Daniel Hamill testified at the hearing. Tr. 87. Dr. Hamill has not treated or examined Emmitt but reviewed the medical records. *Id.* He testified that Emmitt has bipolar disorder, as well as two learning disabilities in reading and writing. Tr. 87-88. He testified that Emmitt has had "significant interpersonal problems all of her days." Tr. 90-91. According to Dr. Hamill, Emmitt has "certainly an unwillingness" to get along with people. Tr. 91. Dr. Hamill further opined that this is an inability "because the treatment for bipolar disorder has been so spotty." Tr. 91. He further testified that Emmitt's "bipolar disorder is certainly at the listing level when she's off her medications, which is frequent." Tr. 92. Dr. Hamill testified that Emmitt's condition may "certainly" be remediated with proper medication but there is no history of good compliance. Tr. 102-03. He testified that Emmitt's June 2014 hospitalization was a serious decompensation. Tr. 92. Dr. Hamill opined on the 2010 IQ scores which he rejected. Tr. 93-94. He testified "[Emmitt] is smarter than that" based on the educational record. *Id.* Additionally, Dr. Hamill opined that it is not a symptom of bipolar to not follow through with treatment, only a "steeper climb." Tr. 97.

Plaintiff alleges the ALJ should be reversed based on the ALJ's failure to follow the AC remand order. (Document 20 at 7). The Appeals Council on remand ordered the ALJ to do the following:

> Follow the requirements in Social Security Ruling 82-59 to determine whether the claimant would not be found disabled if she followed prescribed treatment. This analysis should include whether the treatment is prescribed

by the claimant's treating source, whether the treatment is expected to restore ability to work and, if necessary, whether there is a justifiable cause for failure to follow prescribed treatment pursuant to SSR 82-59.

Tr. 214. The remand order required the ALJ to reconsider the RFC, "[i]f necessary," and obtain evidence from the vocational expert "[i]f warranted by the expanded record." Tr. 214. Plaintiff argues that the ALJ did not follow SSR 82-59 because the ALJ relied on Plaintiff's failure to follow medication or treatment in finding her disabled. (Document 20 at 7). Defendant contends that the AC directive would only come "into play" if the ALJ cited 20 C.F.R. §§ 404.1530, 416.930, and that the ALJ did not determine disability on these grounds. (Document 21 at 3). Further, the Commissioner states the ALJ only used the Plaintiff's non-compliance to determine credibility. *Id.*

Although an ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order," this Court should remand "only where the ALJ's decision fails to apply the proper legal standard or the decision is not supported by substantial evidence" and not solely for failure to comply with an Appeals Council order as it does not, in itself, constitute a reversible error. 20 C.F.R. § 404.977; *Henderson v. Colvin*, 520 F. App'x 268, 273 (5th Cir. 2013).

Under SSR 82–59, "[a]n individual who would otherwise be found under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability." Under SSR 82–59, failure to follow prescribed treatment is an issue "only where all of the following conditions exist":

1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) or, in the case of a disabled widow(er) that the impairment meets or equals the Listing of Impairments in Appendix 1 of Regulations No. 4, Subpart P; and

2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death;

3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and

4. The evidence of record discloses that there has been refusal to follow prescribed treatment.

SSR 82–59. For "failure to follow prescribed treatment" to be identified and addressed under the criteria identified in SSR 82–59, the evidence must first establish "that the individual's impairment precludes [that individual from] engaging in any substantial gainful activity." *See Roberts v. Shalala*, 66 F.3d 179, 183 (9th Cir. 1995) (finding SSR 82–59 only applies to claimants who would otherwise be disabled within the meaning of the Act and that when an ALJ did not premise the denial of benefits solely on failure to follow prescribed treatment, then the claimant was not entitled to the protections of SSR 82–59); *see also Mack v. Comm'r of Soc. Sec.*, 2011 WL 989813 *2 (11th Cir. 2011) (finding a claimant does not fall under SSR 82–59 because the claimant is not disabled within the meaning of the Act); *Elam v. Barnhart*, 386 F. Supp. 2d 746, 758 (E.D. Tex. 2005) (ruling the claimant's impairments were not disabling or that treatment may restore the claimant's ability to work therefore the ALJ did not need to determine claimant's reason for failure to follow prescribed treatment).

SSR 82-59 applies when the ALJ's RFC determination or the ultimate disability determination rests on the Plaintiff's failure to follow prescribed treatment. *See Fall v. Astrue*, No. CIV.A. H-12-0265, 2012 WL 6026438, at *10 (S.D. Tex. Dec. 4, 2012); *see also Lindsey v. Astrue*, No. 3:09-CV-1649, 2011 WL 817173 (N.D. Tex. Mar. 9, 2011) (requiring an ALJ to use SSR 82-59 when that ALJ relies exclusively on noncompliance with prescribed treatment to determine Plaintiff's RFC provides the basis for the ALJ's decision).

However, an ALJ may consider noncompliance as a proper factor when making a

determination as to disability if noncompliance is considered "only as part of the credibility determination." *Mitchell v. Colvin*, No. 3:11-CV-2664-BN, 2013 WL 4546729, at *7 (N.D. Tex. Aug. 28, 2013) (citing *Robinson v. Astrue*, No. H–09–2497, 2010 WL 2606325, at *8 (S.D. Tex. June 28, 2010)); *see also Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990).

Plaintiff argues that the ALJ failed to follow the AC remand by "repeatedly mention[ing] times in which Plaintiff has been off her medication in his decision." (Document 15 at 7). Plaintiff's points to the ALJ, when discussing the claimant's medical history, who wrote: "However, she has consistently failed to maintain medical compliance and has refused to follow through with counseling or therapy" and when discussing Dr. Hamill's testimony, the ALJ wrote: "[C]laimant's failure to get consistent treatment in the past has limited her ability to function at a higher level." Tr. 30, 33.

An ALJ's RFC analysis includes all the symptoms and extent to which the symptoms are consistent with the medical evidence, meaning the ALJ must look to the medical evidence and evaluate the credibility and the extent of the functional limitations. *See* 20 CFR §§ 404.1529, 416.929. Here, upon the remand, the ALJ considered not only Emmitt's noncompliance, but also Emmitt's ability to clean and take care of herself, ability to leave the house with her stepmother, self-isolation, time spent only with family, ability to fill out own Functional Report despite spelling and reading difficulties, and past fights with others. Tr. 27-28. Furthermore, the ALJ goes into detail over the various medical evidence and reports that document Emmitt's symptoms and find them to reasonably expect alleged symptoms but not to the "intensity, persistence and limiting effects" Emmitt alleges. Tr. 28. It is in this consideration that the ALJ considers Emmitt's noncompliance, which is permitted without invoking SSR 82-59. *Fall*, 2012 WL 6026438, at *10.

Also, the Appeals Council refused to hear the case again, supporting the claim that the ALJ

did not violate the remand order. *Henderson v. Colvin*, 520 F. App'x 268, 274 (5th Cir. 2013) ("Had the Appeals Council thought that the ALJ had not complied with its remand order, the Appeals Council could have granted Henderson's request for review, which it denied.").

The regulations require the ALJ to determine a claimant's RFC by considering all of the relevant evidence and addressing the claimant's exertional and non-exertional limitations. 20 C.F.R. §§ 404.1545, 416.945; SSR 96–8p. Residual functional capacity "is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96–8p; *see also Irby*, 180 F. App'x at 493. Although opinions from medical sources must be considered by the ALJ "on issues such as whether ... impairment(s) meet[ ] or equal[ ] the requirements of any impairment(s)" listed, RFC and the application of vocational factors are to be decided by the Commissioner. 20 CFR §§ 404.1527(d)(2), 416.927(d)(2); *Jowers v. Colvin*, No. 1:15-CV-130-BL, 2016 WL 4131828, at *2 (N.D. Tex. Aug. 2, 2016).

However, an RFC determination must be made based upon "all of the relevant evidence in the case record," including, but not limited to, medical history, medical signs, and laboratory findings, the effects of treatment, and reports of daily activities, lay evidence, recorded observations, medical source statements, and work evaluations. SSR 96–8p. An ALJ must assess a claimant's RFC at the ALJ hearing and must consider the entire record. 20 C.F.R. §§ 404.1546(c), 416.946(c); SSR 96–8p; *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir.1995); *Riley v. Astrue*, No. 1:09-CV-0102-C ECF, 2011 WL 900584, at *4 (N.D. Tex. Mar. 15, 2011). The RFC must be supported by substantial evidence, meaning "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not

be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

The ALJ must assess the Plaintiff's RFC by making a "function-by-function analysis of a claimant's ability to do work-related activities" made by medical examinations. *Onishea v. Barnhart*, 116 F. App'x 1, 2 (5th Cir. 2004) (citing *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001)); *see also* SSR 96–8p. Furthermore, the Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting" the RFC. *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir.1984). The Court may find no substantial evidence for the decision only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Johnson*, 864 F.2d at 343; *see e.g.*, *Myers v. Apfel*, 238 F.3d at 621 (5th Cir. 2001).

Once the ALJ determines a claimant has a mental impairment, the ALJ must assess the impairment's degree of functional limitation on a claimant's ability to: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 USC §§ 404.1520a(b)(2), (c), 416.920a(b)(2), (c). These functional areas are rated on a five-point scale: none, mild, moderate, marked, and extreme. 20 USC §§ 404.1520a(c)(4), 416.920a(c)(4). The "extreme" rating represents a degree of limitation that is incompatible with the ability to do any gainful activity. *Onishea*, 116 F. App'x at 1-2; *see also Irby v. Barnhart*, 180 F. App'x 491, 493 (5th Cir. 2006). If the impairment is severe but does not reach the level of a listed disorder, then the ALJ must conduct an RFC assessment. 20 CFR §§ 404.1520a(d)(3), 416.920a(d)(3); *Onishea*, 116 F. App'x at 1-2; *see also Irby*, 180 F. App'x at 493.

Here, the thoroughness of the ALJ's decision shows that he considered Emmitt's ability in each factor described above. Tr. 24-27. Namely, Emmitt's ability to (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt

or manage oneself. 20 USC §§ 404.1520a(b)(2), (c), 416.920a(b)(2),(c); Tr. 24-27. Thus, the ALJ employed the legal standard set forth in *Myers* and SSR 96–8p in determining Emmitt's RFC. *Onishea*, 116 F. App'x at 2.

Substantial evidence supports the ALJ's finding that Emmitt's bipolar disorder and learning disabilities were severe impairments at step two, and such impairments at step three, individually or in combination, did not meet or equal a listed impairment. The ALJ rated the degree of the functional limitation resulting from Emmitt's medically determinable impairments in the broad functional of understanding, remembering, or applying information; interacting with others; concentration, persistence, or pace; and adapting or managing themselves. In understanding, remembering, or applying information, the ALJ found moderate limitation in recalling and using information. Tr. 24. Greater limitation was not found because the ALJ did not find evidence that she could not carry out simple instructions or sustain an ordinary routine. *Id.* The ALJ found moderate limitations in ability to interact with supervisors, co-workers and the public. *Id.* The ALJ supports his finding by citing Emmitt's anger management behaviors and self-isolation, as well as her "conduct disorder related issues" that did not follow her into adulthood. *Id.* The ALJ found moderate limitations in Emmitt's ability to concentrate, persist, or maintain pace because her limited ability to work with or in proximity to others without being distracted and to work without interruptions from psychologically based symptoms or rest periods. Tr. 25. As for Emmitt's ability to adapt or manage oneself, the ALJ found mild limitations because he found no limitations in her ability to respond to changes or adapt to normal hazards. *Id.*

The ALJ's RFC determination is consistent with Emmitt's consultative exams and the medical record and the ALJ's opinion that Emmitt was not a fully reliable source. None of the mental exams determined Emmitt was unable to perform basic work activities. Although Emmitt

received low GAF scores related to her mental health, including suicidal ideations and unsupportive home life, the scores do not equate to limitations on Emmitt's ability to perform basic work activities. Here, the ALJ found Emmitt's impairments to be severe, considered the medical treatments notes and consulting examinations by Dr. Lonnecker, Dr. Pate, and Dr. Pelligrini, and included in Emmitt's RFC that Emmitt was restricted to simple work with occasional interaction with the public. Plaintiff argues that the evidence does not suggest that Plaintiff is better adept in interacting with co-workers or supervisors, than with the public. (Document 20 at 11). As discussed above, when a matter is in remand, the ALJ is not bound by previous limitations. Emmitt's mental conditions improved when she was taking prescribed medications. *See* Tr. 824, 953-57, 1081-164, 1199-203. Substantial evidence supports the ALJ's finding that Emmitt had the RFC to perform simple work with no production rate pace, simple word recognition and counting, no reading for meaning or writing required and occasional intersection with the public. Tr. 27. Based on the objective medical evidence, as thoroughly discussed by the ALJ in his decision, substantial evidence supports the ALJ's step two and step three determination. Substantial evidence also supports the ALJ's RFC assessment This factor weighs in favor of the ALJ's decision.

B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. The Social Security regulations require the Commissioner to evaluate every medical opinion it receives, regardless of its source. 20 C.F.R. §404.1527(c). The regulations provide in pertinent part that "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and

prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."
20 C.F.R. § 404.1527(a)(1). The ALJ has the ultimate responsibility to determine disability status.
*Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001). When good cause is shown, less weight, little
weight, or even no weight may be given to a treating physician's opinion. *Id.* The Fifth Circuit in
*Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000), held that when a treating physician's opinion
about the nature and severity of a claimant's impairment is well-supported and consistent with
other substantial evidence, an ALJ must afford it controlling weight. The Fifth Circuit further
instructed that an ALJ has good cause to discount an opinion of a treating physician where "the
treating physician's evidence is conclusory, is unsupported by medically acceptable clinical,
laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 456. In
such a situation, the ALJ must assess what weight the opinion should be given based on factors
enumerated in 20 C.F.R. § 404.1527(c). Those factors include: (1) the physician's length of
treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent
of the treatment relationship; (4) the support of the physician's opinion afforded by the medical
evidence of record; (5) the consistency of the opinion with the record as a whole; (6) the
specialization of the treating physician; and, (7) any other considerations. *Id.* These factors need
not be considered when there is "competing first-hand medical evidence and the ALJ finds as a
factual matter that one doctor's opinion is more well-founded than another," or when "the ALJ
weighs treating physician's opinion on disability against the medical opinion of other physicians
who have treated or examined the claimant and have specific medical bases for a contrary opinion."
*Newton*, 209 F.3d at 458. Simply put: "[t]he Newton court limited its holding to cases where the
ALJ rejects the sole relevant medical opinion before it." *Qualls v. Astrue*, 339 F.App'x 461, 467
(5th Cir. 2009). An ALJ is free to reject the opinion of any physician when the evidence supports

a contrary conclusion. *Newton*, 209 F.3d at 455. "The ALJ cannot reject a medical opinion without an explanation." *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000); *Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017) (finding the ALJ committed error in failing to address examining physician's conflicting opinion thereby making it impossible to know whether the ALJ properly considered and weighed the opinion); *but see Hammond v. Barnhart*, 124 Fed. App'x 847, 851 (5th Cir. 2005) (finding that failure by ALJ to mention a piece of evidence does not necessarily mean that the ALJ failed to consider it). Thus, the absence of an express statement in the ALJ's written decision does not necessarily amount to reversible error because procedural perfection in administrative proceedings is not required. *See, e.g., Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007); *Jones v. Astrue*, 691 F.3d 730, 734-35 (5th Cir. 2012) ("The party seeking to overturn the Commissioner's decision has the burden to show that prejudice resulted from an error.").

Here, the thoroughness of the ALJ's decision shows that he carefully considered the opinion evidence. The ALJ gave Dr. Lonnecker's, Dr. Pate's and Dr. Hamill's opinions great weight. Upon this record, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and any corroboration. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook*, 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984. 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made

by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Setters*, 914 F.2d at 618-19 (citing *Farrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALL, who has had the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

In a functional report that Emmitt completed on August 13, 2014, she denied being able to read or spell. Tr. 620. Emmitt stated that she has difficulty sleeping because her bipolar disorder causes excessive thinking and crying. Tr. 621-22. Emmitt wrote that she often does not dress, bath, care for her hair or eat. *Id.* However, Emmitt denied needing reminders to take care of herself. Tr. 622. In terms of home care, Emmitt cleans up the home but notes it takes a while, and that she does not need help or encouragement doing these things. *Id.*

She wrote that she needs reminders to take her medication. *Id.* She denied medication side effects. Tr. 627. Emmitt claims her illness affects understanding and attention. Tr. 625. She stated that she cannot pay attention for very long. *Id.* Additionally, she stated she does not finish what she starts and cries to handle stress. Tr. 626.

Emmitt also stated she has trouble getting along with family, friends, neighbors, or others because ""they try to run [her]" Tr. 625. Emmitt wrote that she does not like going outside and avoids it; although she does go shopping, either by foot or riding in a car. Tr. 623. Additionally, she goes out alone. *Id.* She indicated she has been fired or laid off from her job because she could

not get along with others. Tr. 626. At the April 4, 2016 hearing, Emmitt testified that she last worked in 2015 at a Wal-Mart, but she was let go because "they found out [her] condition." Tr. 67. Additionally, she testified she "always gets fired" and her medication, at the time Trazodone, Abilify, and Paxil, "puts [her] to sleep." Tr. 72-73. However, she stated her bipolar and schizophrenia are being treated with the medication. *Id.* She testified about several hospitalizations. Tr. 81-83. When admitted to Ben Taub in March 2016 she complained of voices. Tr. 82-83. Emmitt testified she started hearing voices at age 8. *Id.*

According to Emmitt, "everybody claim[s]" that she fights and if she tries to work she will not get hired. Tr. 73-74. Emmitt testified that she gets in fights with "[e]verybody" – "other people working there or customers" – because people "don't know how to talk" and she gets mad and beats them up. Tr. 74. She testified it is the only way she knows how to solve problems. Tr. 74-75. She testifies she this she has difficulty in understanding what people are asking her to do and feels that they are trying to take advantage of her. Tr. 80. In a hypothetical discussion about how she would respond if a supervisor requested she redo a job, she testified she would get mad because the job is already done right so she would not "[go] back to do nothing over [sic]." Tr. 83-84.

She testified she has never been to jail and stays at home to avoid trouble. Tr. 75. She stated does not like people. *Id.* Emmitt testified she goes shopping or to restaurants with her stepmother. *Id.* She claims that this arrangement is okay. *Id.* When she was in school, she was suspended or expelled for fighting with teachers and was kicked off the basketball team for punching a girl in the face. Tr. 76-77. She testifies that she did not return to school after these incidents in the tenth grade because she felt that no one was going to help her. Tr. 77. She further testified that she was in special education classes and was made fun of by others. Tr. 79. She would get angry that she was not able "to do stuff" and others would make fun of her. Tr. 81. In the second hearing from

February 27, 2017, Emmitt testified that she had been taking Gabapentin and Abilify and was keeping up with her medications, taking classes for anger, and seeing a therapist. Tr. 120. She also testified since the last hearing she has had no alcohol or drugs. Tr. 118-19. She was living with her stepmother. *Id.* She testifies she does not have friends because they think she is "crazy." Tr. 121.

In April 2011, consulting examiner Dr. Pate opined that Emmitt was responsive and tearful, she was well groomed normally, and she had below average intelligence. Tr. 814. In terms of her daily living, Emmitt described helping out around her friend's house where she's living. *Id.* She also stated that she rides the bus on occasion. *Id.* She rarely goes outside, has a best friend, interacts with family, but feels subpar because of her intellect. Tr. 815.

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighted testimony improperly. The ALJ tied his findings to Emmitt's reported activities of daily living as set forth by the function reports, in the medical records and testified to at the hearing. Accordingly, this factor supports the ALJ''s decision.

### D. Educational background, work history and present age

Here, at step four, the ALJ found that Emmitt could not return to past relevant work as a babysitter. In addition, the ALJ proceeded to step five. The final element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

Emmitt was born on March 3, 1991, and she was twenty-eight years old at the time of the second hearing on February 27, 2017. Tr. 112-26. The highest grade of schooling she completed

was ninth grade and attended special education courses since second grade. Tr. 587, 862, 1200. Emmitt had past work as a stocker, babysitter, and washing dishes. Tr. 65, 67, 587.

The record shows that the ALJ questioned Kay Squires Gilreath, a VE, at the hearing.[4] It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling*, 36 F.3d at 436.

The ALJ posed comprehensive hypothetical questions to the VE and Emmitt's non-attorney representative questioned the VE. Tr. 121-24. The record shows the following hypothetical questions were posed at the hearing by the ALJ:

> Q. ... Assume a person of the same age, education and past work experience as the claimant. Assume a person with no exertional limitations, limited to simple, non-production rate paced job, occasional interaction with the public, be limited to simple work recognition, simple counting, no reading convening, no writing required. Could allow for past work?
>
> * * *
>
> A. No.
>
> * * *

---

[4] "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).

Q. Other jobs available?

A. Within that hypothetical, one could work as a dishwasher, medium, unskilled, 2, 318.687-010, over 10,000 in the state, over 500,000 nationally. One could be a laundry worker which is medium, unskilled, 2, 361.684-014, over 7,000, over 200,000. One could be an office cleaner, light, unskilled, 2, 323.687-014, over 10,000, over 500,000. (Tr. 121-22).

Claimant's attorney brings up similar issues from the first hearing which would hinder a competitive employment including: marked limitations of any kind, a necessary prompt to complete a task every hour, emotional and verbally or physically aggressive, absent from work more than two days per month – no work, illiterate. Tr. 122-24.

A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. *Bowling*, 36 F.3d at 436. As discussed above, the ALJ's RFC assessment is supported by substantial evidence, and was incorporated in the hypothetical question posed to the VE. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Emmitt was not disabled. Based on the testimony of the VE and the medical records, substantial evidence supports the ALJ's finding that Emmitt could perform work as a dishwasher, a laundry worker, and as an office worker. The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the VE's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Emmitt was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

## VI. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Emmitt was not disabled within the meaning of the Act, that substantial evidence supports the ALL's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 15) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 20) is DENIED, and the decision of the Commissioner of the Social Security Administration is AFFIRMED.

Signed at Houston, Texas, this _1st_ day of _August_, 2019.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE